## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **HAROLD STATEN** : | |
| : | |
| : | |
| **Plaintiff** : | |
| : | |
| **v.** : | **Civil Action No. 24-1380** |
| : | |
| : | **JURY TRIAL DEMANDED** |
| **THE CITY OF PHILADLPHIA and** : | |
| **DETECTIVE JAMES J. MCNESBY** : | |
| : | |
| **Defendants** : | |

## AMENDED COMPLAINT

Plaintiff, Harold Staten, through his attorneys, Joel J. Feller, and Kevin Harden, Jr., of Ross Feller Casey, LLP, and Todd Newman, Esquire, allege the following:

### INTRODUCTION

1.     Harold Staten spent 37 years, 10 months and 30 days of his life in prison for an arson and murder he did not commit.

2.     The fire science used to convict Mr. Staten was false. There was evidence of its falsity at the time of his conviction that was withheld from the Court by the investigators and intentionally omitted from the evidence presented at trial.

3.     Philadelphia Police deliberately deceived the Court by omitting information from a Philadelphia firefighter that witnessed the decedent blaming his injuries on his girlfriend.

4.     Mr. Staten challenged his conviction after obtaining proof of the false fire science.

5.     On February 5, 2024, the Court of Common Pleas of Philadelphia Country granted Mr. Staten's Post-Conviction Relief Act petition, vacated his life sentence and ordered a new trial.

6.      As argued by Mr. Staten for more than 37 years, there was no credible evidence against him.

7.      37 years too late, the District Attorney's Office of Philadelphia *nolle prossed* the charges against Mr. Staten, freeing him from the burden of his wrongful conviction and incarceration.

8.      It is now known that employees of the City of Philadelphia's police department, through defendant Detective McNesby and others, deliberately deceived the Court by omitting material relevant facts to deceive the Court prior to Mr. Staten's arrest and continuing this deception throughout his trial, conviction and almost four-decade incarceration.

9.      Mr. Staten's conviction was caused by numerous violations of his constitutional rights under state and federal law.

10.      These sorts of violations were known to be a pattern and practice of the Philadelphia Police Department's investigators at the time of his arrest, conviction and throughout his incarceration.

## JURISDICTION AND VENUE

11.      This Court has jurisdiction over the subject matter of this Complaint under 42 U.S.C. §1983 and 28 U.S.C. §§1331, 1343(a)(3), 1343(a)(4) and 1367(a).

12.      Venue is proper in the Eastern District of Pennsylvania pursuant to 28 U.S.C. §1391(a) in that the Defendants are subject to personal jurisdiction within the Eastern District of Pennsylvania and the events that gave rise to this action occurred within the Eastern District of Pennsylvania.

13.      Even more, the amount in controversy in this matter exceeds $75,000.00.

**JURY DEMAND**

14.    Plaintiff demands a trial by jury on all issues and claims set forth in this Complaint, pursuant to the Seventh Amendment to the United States Constitution and Federal Rule of Civil Procedure 38(b).

**PARTIES**

15.    Plaintiff, Harold Staten is a resident of the Commonwealth of Pennsylvania. He currently resides in the Eastern District of Pennsylvania and resided in the Eastern District of Pennsylvania prior to his wrongful conviction.

16.    Defendant, the City of Philadelphia, is a municipality in the Commonwealth of Pennsylvania and is officially responsible for the policies, practices and customs of the Philadelphia Police Department.

17.    Defendant Detective James J. McNesby was at all times relevant to this Complaint an officer and employee of the defendant City of Philadelphia's Police Department acting under the color of law and within the scope of his employment under the statutes, ordinances, regulations, policies, customs and usage of the City of Philadelphia and its police department. These claims are made against defendant McNesby in his individual capacity.

18.    At all times relevant to this Complaint, Detective McNesby acted in concert with other City of Philadelphia employees, known and unknown, to deprive Mr. Staten of his constitutionally protected rights.

**FACTUAL BACKGROUND**

19.    In the early morning hours of October 30, 1984, a fire broke out at a rowhome at 3011 North Percy Street in the Glenwood neighborhood in North Philadelphia.

20.    Four individuals were asleep on the second floor of the home when the fire started.

21.     All four individuals escaped the fire by jumping from second floor windows.

22.     One man, Mr. Charles Harris, died as a result of severe burns he sustained in the fire. These burns covered a significant portion of his upper torso.

23.     As Mr. Harris was being rushed to the emergency room, a firefighter witnessed that "he held his arms out, the skin was hanging off" and exclaimed to his girlfriend Marian DeBose "Look, see what you did to me!"

24.     Despite the decedent's statement, investigators focused on Mr. Staten.

25.     No information about Mr. Harris' statement to Ms. DeBose was included in the affidavit of probable cause or the trial testimony.

26.     No exculpatory information was included in the affidavit of probable cause as required by the United States Constitution.

27.     But for the omission of exculpatory information from the affidavit of probable cause, no arrest, prosecution, conviction, and incarceration would have occurred.

28.     During the arson investigation, a fire investigator inappropriately presumed and subsequently concluded that "an open flame applied to an accelerant" in the vestibule area of the home caused the fire.

29.     Contrarily, the Philadelphia Police Department's crime laboratory conducted testing on samples from the alleged origin point of the fire and determined that there were no detectible volatile flammable vapors in the samples provided.  This information was not included in the affidavit of probable cause by Detective McNesby.

30.     Had this information been properly included in the affidavit of probable cause, no arrest, prosecution, conviction, and incarceration would have occurred.

31.     Detective McNesby was the author of and swore to the accuracy of the affidavit of probable cause supporting Mr. Staten's arrest on March 20, 1986.

32.     A fireman also noted a seperate fire in the second-floor back bedroom that went uninvestigated. This was the room inhabited by the decedent, Mr. Harris, and the woman Mr. Harris accused of setting him on fire, Marian DeBose. None of this information was included in the affidavit of probable cause.

33.     For almost one and a half years, the case went cold, despite the evidence against Marian DeBose.

34.     Numerous witnesses provided statements that exculpated Mr. Staten. These exculpatory statements were from eyewitnesses. None of these statements were included in the affidavit of probable cause and many were illegally suppressed by defendant McNesby until just before Mr. Staten's exoneration.

35.     Eventually, Philadelphia Police found and interviewed a 17-year-old girl. She alleged that she lived across the street from the fire and was awakened by a resident of the home screaming about the fire and her broken legs.

36.     In her initial interview, the 17-year-old witness denied seeing Mr. Staten before, during or after the fire. None of the information from this initial statement was included in the affidavit of probable cause.

37.     Throughout the investigation, Mr. Staten cooperated with police. None of this information was included in the affidavit of probable cause.

38.     Somehow, the investigators developed a theory that Mr. Staten lit the home on fire over a $14.00 can of roach spray stolen by one of the home's occupants.

39.     Mr. Staten worked as an exterminator at the time.

40.    Mr. Staten acknowledged a dispute over the pest control supplies but explained to police that the dispute had been resolved. None of this information was included in the affidavit of probable cause.

41.    Mr. Staten explained to police that he learned that others were responsible for the theft of the supplies and even provided police with the names of the men responsible for the theft to show his lack of motive. None of this information was included in the affidavit of probable cause.

42.    Upon information and belief, Mr. Staten agreed to a polygraph examination and its results were "no deception indicated" regarding his lack of involvement in the fire. None of this information was included in the affidavit of probable cause.

43.    Mr. Staten also provided the police with an alibi and witnesses to his whereabouts on the evening of the fire. None of this information was included in the affidavit of probable cause.

44.    Finally, Mr. Staten explained that his pest control supplies were not flammable and provided the police with the brand name of his pest control supplies to further support his innocence. None of this information was included in the affidavit of probable cause.

45.    Four months after her initial statement, the 17-year-old witness that initially claimed that she hadn't seen Mr. Staten on the night of the fire and was first awakened by the screams of a woman that escaped the fire, abruptly changed her story and claimed that she saw Mr. Staten from the window of her bedroom.

46.    In her new version of events, she saw Mr. Staten at the steps of the rowhome with a hose and a can starting the fire. None of the true circumstances as to why she changed her statement were included in the affidavit of probable cause.

47.     In this new version of events, the 17-year-old recognized a man she knew to be Mr. Staten from more than 100 feet away in the middle of the night, while he was huddled at the front door, using a hose to put liquid through the mail slot of the home until he left. In this new version of events, she saw smoke after Mr. Staten left but took no action until after the conflagration grew out of control.

48.     No other witness, including the witnesses that were present in the home with this 17-year-old witness, corroborated her version of events.

49.     In fact, the 17-year-old's boyfriend, who was present in the same room, testified that she was sleeping when they first heard the screams for help.

50.     Despite the obviously contradictory evidence, on October 7, 1986, after a bench trial before the Honorable Lisa Richette, the Court convicted Mr. Staten of all charges, including second-degree murder, arson and numerous counts of aggravated assault.

51.     For more than a year after the judgment, the Court delayed sentencing to deliberate over evidence from new witnesses that Mr. Staten's initial trial counsel failed to call at trial.

52.     Numerous witnesses testified that the 17-year-old witness, who was the only "eyewitness" against Mr. Staten, was lying about what she observed.

53.     Additionally, other witnesses testified to further support Mr. Staten's alibi and to further refute the Commonwealth's motive evidence.

54.     The trial court stated **on the record** that the evidence presented at the hearing "**merits a new trial**."

55.     Despite this statement and after 2 years of deliberation, the trial court entered an order denying Mr. Staten's post-trial motions. No explanation was offered.

56.    On February 8, 1989, the trial court sentenced Mr. Staten to life imprisonment for a crime he did not commit.

57.    We now know that numerous statements exculpating Mr. Staten were withheld from Mr. Staten, his counsel and the Court until 2022.

58.    Before and after his conviction, numerous witnesses recanted their statements implicating Mr. Staten and confirmed that they had made additional statements that Detectives failed to record or provide to Mr. Staten or to the court during trial.

59.    After Mr. Staten's conviction, numerous witnesses provided additional evidence refuting the testimony of the sole eyewitness.

60.    After the conviction, serious concerns about the sole eyewitness' credibility were unearthed, including evidence of inappropriate contact between the minor witness and Philadelphia Police Department homicide investigators, including Defendant McNesby, serious mental health issues, and drug and alcohol dependency issues, including evidence that the eyewitness was blacked out from a combination of alcohol and cocaine on the night of the fire – to the point that she had been carried to bed by her roommate and romantic partner before she was awakened by the screaming. None of this was included in the affidavit of probable cause or revealed at trial.

61.    At a post-trial hearing, a witness stated that police started treating the sole eyewitness to lunch to convince her to testify against Mr. Staten. The sole eyewitness told this witness that she decided to lie about Mr. Staten's involvement after these investigators began treating her to lunch. None of these lunches were documented, nor were the nature of these lunches and what was discussed between this minor-witness and the investigators, documented in the affidavit of probable cause or provided to Mr. Staten until after his conviction.

62.     Upon information and belief, during these lunches, the investigators coerced the sole eyewitness, who had a documented history of drug and alcohol abuse, removal of her children by social workers, and a significant history of mental health problems, including short- and long-term memory loss, into providing untruthful statements and testimony against Mr. Staten.

63.     After the conviction, a witness that told police Mr. Staten confessed to him, revealed that he was incarcerated on the day he claimed to have had an incriminating conversation with Mr. Staten.

64.     Most importantly, the motive asserted by the police and prosecution was rebutted by an October 30, 1984, Philadelphia Police Department Arson Investigation Memo and a November 17, 1984, Activity Sheet, **both of which were not disclosed** to Mr. Staten, his defense counsel or the court, which documented an interview with victim Robert Williams.

65.     Robert Williams was the witness that established Mr. Staten's motive for committing arson. The neighborhood rumor was that Staten believed Williams stole his pest control supplies.

66.     In the activity sheet, Detectives documented an interview with Williams, who was injured in the fire, where Williams stated that Staten hadn't threatened him and rebutted claims that Staten had threatened to burn the house down over missing pest control products. This activity sheet directly contradicted Williams' trial testimony and the affidavit of probable cause.

67.     The activity sheet states that Mr. Williams didn't think Mr. Staten started a fire.

68.     None of the information about Mr. Williams initial informal interview with investigators was disclosed in the affidavit of probable cause nor was it disclosed prior to trial.

69.     Due to these failures, Mr. Staten languished in prison for decades because both his appellate and collateral appellate rights had been exhausted.

70.    Decades after Mr. Staten's conviction, two forensic fire investigators re-investigated the arson allegedly started by Mr. Staten.

71.    One investigator, hired by counsel for Mr. Staten, concluded that modern forensic science standards would have led to an "undetermined" cause of the fire.

72.    A second investigator, hired by the Philadelphia District Attorney's Office, concluded that the cause of the fire should have been ruled "undetermined" because of a "misunderstanding and application of fire science principle" that "led to unsupportable conclusions about the origin and cause" of the fire.

73.    Fire science establishes that Mr. Staten was falsely convicted of arson.

74.    The decedent's cause of death, the second fire located inside the decedent's room, and the decedent's accusation against Marian DeBose, all establish that Harold Staten was maliciously prosecuted despite credible evidence of another suspect accused by her dying boyfriend immediately after the catastrophic event.

75.    Sadly, it took until February 5, 2024, for the Court of Common Pleas of Philadelphia County to grant Mr. Staten's motion for a new trial.

76.    On February 5, 2024, the Court discharged Mr. Staten, now a 71-year-old great-grandfather, from custody due to the Commonwealth's inability to prosecute the case against him, given substantial evidence of his innocence.

77.    Mr. Staten now sues the City of Philadelphia and defendant McNesby for violations of his constitutional rights that caused his illegal arrest, malicious prosecution and wrongful conviction and incarceration.

78.     Defendant McNesby, as the lead detective on this matter, had knowledge of everything in the case file, or under the doctrine of collective knowledge, was aware of the facts known to his co-conspirators and other investigators.

## UNCONSTITUTIONAL MISCONDUCT IN HOMICIDE INVESTIGATIONS

79.     The Philadelphia Police Department has a pervasive pattern and practice of unconstitutional misconduct in their homicide investigations, including coercion and inducement of false statements from witnesses, suggestive identification techniques, suppression and withholding of exculpatory and inconsistent evidence, perjury or "testilying," deliberate deception, fabrication of evidence and omission of exculpatory information from charging documents. These unconstitutional practices date back to at least the early 1970's and have continued up to and beyond the investigation and prosecution of Mr. Staten.

80.     Throughout that same timeframe, the City of Philadelphia had, in force and effect, policies, practices and customs of unconstitutional misconduct in their homicide investigations, including coercion and inducement of false statements from witnesses, suggestive identification techniques, suppression and withholding of exculpatory and inconsistent evidence, perjury or "testilying," deliberate deception, fabrication of evidence and omission of exculpatory information from charging documents.

81.     At the time of the investigation and prosecution of Mr. Staten, the Philadelphia Police Department had a policy, practice or custom of using various techniques to coerce or induce false statements and identifications, including, but not limited to, subjecting witnesses to needlessly prolonged interrogations and interviews, failing to record interviews and interrogations, isolation, making false promises, threatening charges for unrelated misconduct, offering assistance in unrelated criminal and personal matters without proper documentation, interviewing witnesses

while they are under the influence of drugs that make them more susceptible to coercion, and assertions that witnesses will benefit from making a statement that assists the police or suffer some sort of disadvantage, punishment or incarceration if they refuse.

82.     At the time of the investigation and prosecution of Mr. Staten, the Philadelphia Police Department had a policy, practice or custom involving the use of various techniques to suppress and withhold material and relevant statements and evidence, in violation of their known duty under the United States and Pennsylvania Constitutions, including, but not limited to, making false statements to prosecutors and courts about the existence of evidence, failing to provide complete documents and information to prosecutors and courts, coercing and inducing witnesses into keeping exculpatory and inconsistent information from prosecutors and courts, disregarding or deleting exculpatory and inconsistent information from files, ignoring or omitting exculpatory and inconsistent information from documents so there is no record to be deleted, omitted or suppressed, threatening witnesses in possession of exculpatory and inconsistent information to prevent them from coming forward to prosecutors and testifying and deleting information relating to or identifying material and relevant witnesses so they do not testify at trial.

83.     These policies, practices and customs involved the use of various techniques to coerce and induce inculpatory statements, including, without limitation, isolation, separating children, teenage and otherwise vulnerable suspects or witnesses from their friends and family, subjecting individuals to needlessly prolonged interviews and interrogations, making false promises, including the promise that a suspect or witness will be allowed to go home if he or she makes an inculpatory statement, the use or threat of physical violence, authoritative assertions of a suspect's guilt, including, without limitation, confrontation with false inculpatory evidence, and providing false assurances that the suspect or witness will benefit from making an inculpatory

statement that minimizes the witness or suspect's own involvement or provides the witness with some sort of benefit.

84.    These policies, practices and customs also involved the use of various deceitful techniques to make false statements appear true and reliable, including, without limitation, providing a witness or suspect with details about the crime that only the perpetrator or police could know, whether through leading questions or more direct communication, taking misleading steps to make coerced or induced statements appear as if they originated from the suspect following a lawful interrogation, selectively documenting a witness or suspect's eventual statement and not the preceding interrogation, preparation and rehearsal, and misrepresenting that a suspect's formal statement was a verbatim statement in the suspect's own words.

85.    These policies, practices and customs are well known to the City of Philadelphia and its policymakers, with respect to criminal investigations and prosecutions because of newspaper investigations, including Pulitzer Prize winning reporting in the Philadelphia Inquirer in 1977-1978 ("The Homicide Files"), governmental investigations, judicial opinions and decisions, complaints from lawyers and civilians, complaints lodged by the public, prior litigation against the City of Philadelphia and internal police investigations.

86.    The Homicide Files reporting documented that between 1974 and 1978, 1 in 5 interviews or confessions obtained by homicide detectives were excluded due to "beatings, threats of violence, intimidation, coercion and knowing disregard for constitutional rights in the interrogation of homicide suspects and witnesses."

87.    The Homicide Files reporting documented beatings intended to deceive the Courts that left no visible injuries, including intentional strikes to the abdomen, groin, feet and ankles, and the use of a phone book to blunt repeated strikes to the head.

88.     The Homicide Files reporting documented a vigilante mindset amongst Homicide Detectives in the same timeframe of Mr. Staten's conviction, with detectives providing interviews where they explained that the "homicide detective must fight the lawyers, the judges, the Supreme Court – and he must fight crime" and "outrage at a court system that allows murderers to 'walk' or go free." Training, supervision, and discipline concerning probable cause and the constitutional bounds of investigating crime, including interviews of witnesses were nonexistent, disregarded throughout the chain of command, or superficial.

89.     The Homicide Files reporting documented testimony from an Assistant District Attorney who described direct supervision of violently corrupt homicide investigation by then-Police Commissioner Joseph O'Neill and Chief Inspector Joseph Golden. Despite the Commissioners' direct involvement and supervision, a judge concluded that a suspect was "beaten" with a lead pipe, punched with brass knuckles and handcuffs and grabbed by the testicles. No one was disciplined.

90.     The Homicide Files reporting documented a culture of misconduct so thoughtless that homicide detectives would sometimes obtain confessions from co-defendants that were factually impossible – such as two men confessing to firing the sole bullet that killed a homicide victim.

91.     The Homicide Files reporting documented dozens of unlawful interrogations, gruesome beatings that caused hospitalizations and wrongful convictions, and an absolute refusal by policy makers for the Philadelphia Police Department or defendant City of Philadelphia, to acknowledge the criminal and unconstitutional misconduct of its homicide detectives.

92.     The Sex for Lies Corruption Scandal involved widespread unconstitutional practices that were not appropriately addressed or remediated despite pervasive knowledge

throughout the Philadelphia Police Department, the City of Philadelphia, and the Commonwealth of Pennsylvania.

93.    The police misconduct in the Sex for Lies Corruption Scandal included constitutional violations that mirror those violations suffered by Mr. Staten, including omission of material relevant information, suppression of exculpatory evidence, coercive, inducive and suggestive interview tactics, false allegations of criminal conduct and inappropriately coercive or beneficial relationships with criminal defendants, informant and witnesses.

94.    In the Sex for Lies Corruption Scandal, the City of Philadelphia was deliberately indifferent to misconduct and credible complaints about misconduct, as described in this Complaint, were disregarded.

95.    Various cases demonstrate that misconduct was pervasive within Philadelphia's Police Department at time of the investigation and subsequent prosecution of Mr. Staten. This misconduct was pervasive within the Philadelphia Police Department's Homicide Unit before and after the wrongful arrest, conviction, and incarceration of Mr. Staten.

96.    The misconduct described in this Complaint was committed and deliberately ignored by Homicide Unit and Police Department supervisors because of their routinely deliberate indifference to this sort of misconduct.

97.    The cases demonstrating deliberate indifference to Homicide Unit misconduct in the timeframe of Mr. Staten's wrongful conviction were recently described by the Philadelphia Inquirer in Part 3 of its "Losing Conviction" series. The report describes the convictions of exonerees William Franklin and Willie Stokes, both of whom were wrongfully convicted of homicide in the 1980s due to misconduct in the Philadelphia Police Department's Homicide Unit.

98.     Referred to as the Sex for Lies misconduct cases, they demonstrate notice to the Courts, City policymakers and the public of Philadelphia Police Department misconduct.

99.     The misconduct of Philadelphia Police Department's homicide detectives was so widespread in the 1980s that the Superior Court of Philadelphia reversed and vacated the conviction of Arthur Lester because of the 1983 conduct of Philadelphia homicide detectives.

100.     Specifically, the Superior Court explained that "there is … uncontested evidence that Lester was visited by three women who, at separate times, engaged in sexual relations with him at the Police Administration Building in the months following his confession." They further reasoned that "[a]ll three women testified … that they were admitted to the Police Administration Building to see Lester," that they were "permitted to visit freely with Lester in a closed, private room for significant periods of time" and "[a]ll three women testified that they engaged in sexual intercourse with Lester during their visits." Commonwealth v. Lester, 572 A.2d 694 (Pa. Super. 1990).

101.     Most importantly, prosecutors did "not contest that Lester was provided with sex while he was incarcerated" at the Homicide Unit. Id. This was contrary to the sworn testimony of Homicide Detective Lawrence Gerrard, indicating the Commonwealth's belief that Detective Gerrard's testimony lacked credibility.

102.     Philadelphia homicide detectives coordinated sexual intercourse between these women and Lester, who was incarcerated, to induce Lester's false statements and testimony against innocent men accused of murder.

103.     The Philadelphia Police Department never investigated or disciplined any detective regarding the Superior Court's reversal of Mr. Lester's conviction. Detective Gerrard maintained his position in the Homicide Unit, amounting to a tacit, if not explicit approval of his and other

detectives' unconstitutional misconduct, including their offering undocumented and undisclosed inducements to witnesses to provide false statements and testimony against defendants like Mr. Staten.

104.    Similar allegations to those in the Lester case arose in other cases from the timeframe of Mr. Staten's conviction, many of which alleged improper inducement of false testimony and fabricated evidence by Philadelphia Police Department detectives.

105.    Other convictions that later resulted in exonerations or acquittals demonstrate the unabated and pervasive patterns, practices and customs of official misconduct within the Homicide Unit of the Philadelphia Police Department. They include the exonerations of:

**a.** Willie Stokes
**b.** Terrance Williams
**c.** Raymond Carter
**d.** Curtis Crosland
**e.** Andrew Swainson
**f.** Anthony Reid
**g.** Ronald Johnson
**h.** Christopher Williams
**i.** Chester Hollman
**j.** Willie Veasy
**k.** Theophalis Wilson
**l.** Anthony Wright
**m.** Johnny Berry
**n.** Daniel Gwynn
**o.** Walter Ogrod
**p.** Lance Felder
**q.** Eugene Gilyard
**r.** John Miller
**s.** Edward Ramirez
**t.** Terrance Lewis
**u.** Termaine Hicks
**v.** Mark Whitaker
**w.** Donald Outlaw
**x.** Kareem Johnson
**y.** Donte Rollins
**z.** Hassan Bennett
**aa.** Tyree Lawson
**bb.** Dontia Patterson

**cc.** Dwayne Thorpe
**dd.** Rafiq Dixon
**ee.** Jamaal Simmons
**ff.** James Frazier
**gg.** Marvin Hill
**hh.** Obina Onyiah
**ii.** India Spellman
**jj.** Arkel Garcia
**kk.** Gerald Camp
**ll.** Sherman McCoy
**mm.** Neftali Velasquez

106.    As a result of a pattern of unconstitutional police misconduct, a pattern that continued at the time of the arrest of Mr. Staten, the United States District Court for the Eastern District of Pennsylvania entered a consent decree in the matter of NAACP v. City of Philadelphia, which required widespread reforms in its police department, while also limiting certain aspects of their investigative practices and policies.

107.    Despite this consent decree, these patterns of misconduct continued then and continue today, as exemplified by the investigation into Mr. Staten's malicious prosecution, and those wrongful convictions detailed in this Complaint, due to the deliberate indifference to these policies, practices and customs by the Philadelphia Police Department and the City of Philadelphia.

108.    Throughout the 1970s and continuing until today, and concurrent with the investigation and prosecution of Mr. Staten by the Philadelphia Police Department, there was a pattern, practice and custom of violating the constitutional rights of criminal suspects and others, including systemic violations of the Fourth and Fourteenth Amendments.

109.    On 3 separate occasions in the 1980's, courts in the Eastern District of Pennsylvania issued orders enjoining the Philadelphia Police Department from engaging in unconstitutional practices:

a. Cliett v. City of Philadelphia: Consent decree arising out of "Operation Cold Turkey", a police practice that resulted in the unlawful arrest and detention of 1500 individuals in drug enforcement practices;

b. Spring Garden Neighbors v. City of Philadelphia: Enjoining police sweeps of Latinos in Spring Garden area in a homicide investigation;

c. Arrington v. City of Philadelphia: Enjoining stops, detentions and searches of African-American men during investigation of the "Center City Stalker";

110.    In 2011, the City of Philadelphia agreed to the appointment of an independent court-appointed monitor following a federal class action lawsuit alleging the improper implementation of an unconstitutional "stop and frisk" policy by the Philadelphia Police Department.

111.    At the time of the investigation and prosecution of Harold Staten, the Philadelphia Police Department had a practice, policy and custom of:

a. Engaging in unlawful interviews of suspects and witness detentions, planting of evidence, fabrication and illegal inducement of witness and suspect statements, and failing to disclose exculpatory evidence;

b. Failing to take appropriate disciplinary or other corrective actions with respect to police officers who engaged in illegal or unconstitutional conduct and obstructing disciplinary processes;

c. Fabrication of evidence and deliberate deception of courts by concealing and suppressing relevant and material evidence, perjury and perjury by omission;

d. Failing to properly train and supervise officers and supervisors with respect to the constitutional limitations on their investigative, detention, search and arrest powers;

e. Ignoring, with deliberate indifference, systemic patterns of police misconduct and abuse of civilians' rights during police investigations and prosecutions of criminal suspects and defendants, including unlawful police interviews, searches, detentions, arrests, coercion of witnesses, falsifying, fabrication and illegal and undisclosed inducement of evidence from witnesses, and suppression of exculpatory evidence;

f. Failing to properly sanction or discipline officers, who are aware of and conceal and aid and abet violations of constitutional rights of individuals by other

officers, thereby causing and encouraging detectives and officers, to violate the rights of citizens, including Mr. Staten.

112.    At the time of the investigation and prosecution of Mr. Staten, and for many years before and thereafter, the City of Philadelphia, has been deliberately indifferent to the need to train, supervise and discipline police officers. The Internal Affairs Division of the Philadelphia Police Department has failed to provide an internal disciplinary mechanism that imposes meaningful disciplinary and remedial actions in the following respects:

a.  excessive and chronic delays in resolving disciplinary complaints;
b.  a lack of consistent, rational and meaningful disciplinary and remedial actions;
c.  a failure to effectively discipline substantial numbers of officers who were found to have engaged in misconduct;
d.  the internal investigatory process fell below accepted practices and was arbitrary and inconsistent;
e.  departmental discipline, as practiced, was incident-based rather than progressive, thus, repeat violators were not penalized in proportion to the number of violations;
f.  the conduct of internal investigations demonstrated that internal affairs personnel were not adequately trained and supervised in the proper conduct of such investigations;
g.  a global analysis of internal investigatory procedures indicated a pattern of administrative conduct where the benefit of the doubt was given to the officer rather than the complainant;
h.  serious deficiencies in the quality of internal investigations and the validity of the departmental findings and conclusions;
i.  lack of an effective early warning system to identify, track and monitor "problem" officers;
j.  the department frequently failed to interview available eyewitnesses to incidents involving citizen complaints of misconduct, interviews that were conducted were below acceptable standards of police practice and failed to address key issues;
k.  the department failed to acknowledge the disproportionate use of force used by police officers in the investigation of citizen complaints and failed to properly categorize the police officers' misconduct in those cases as an impermissible use of force; and
l.  failure to remedy intentional obstruction by officers and others involved in the internal disciplinary mechanism.

113.    At the time of the investigation and prosecution of Mr. Staten, the City of Philadelphia's Police Department employed an incorrect definition of probable cause.

114.    This incorrect definition of probable cause was included in training materials and directives that were authorized by the Department's Police Chief.

115.    This incorrect definition of probable cause caused Philadelphia Police Detectives like defendant McNesby to inappropriately arrest people for crimes, including Mr. Staten.

116.    To this day, the Philadelphia Police Department continues to use an incorrect definition of probable cause in documents relating to arrest warrants, all of which continued to lead to the unconstitutional detention, arrest, and conviction of innocent persons like Mr. Staten.

117.    Defendant McNesby caused Mr. Staten's wrongful arrest, conviction, and incarceration when he engaged in unconstitutionally coercive or inducive interviews, including offering undisclosed inducements, during interviews.

118.    Defendant McNesby's engagement in unconstitutionally coercive or inducive interviews, including offering undisclosed inducements to witnesses he knew were highly vulnerable, amounted to coercion and led to the fabrication of evidence, namely false interviews, statements and trial testimony.

119.    The following constitutional violations contributed to Mr. Staten's conviction in the following ways:

    a.    The unsound definition of probable cause in Philadelphia Police Department policies led defendant McNesby to believe that probable cause existed when it did not. The policy stated that the Mr. Staten only had to be "reasonably connected" to the crime, which is vague and incorrect because a person can be connected to a crime and not be the perpetrator of that crime;

    b.    The undisclosed coercive and inducive interviews of the sole eyewitness, a drug-addicted minor with serious mental health and neurological issues led to her

creating a false story that defendant McNesby and his colleagues knew to be false. These statements and testimony were only made to appease defendant McNesby or the other investigators and given the highly vulnerable status of the victim, they amounted to both coercion and knowing evidence fabrication;

c.    The arrest warrant omitted highly relevant facts, including witness recantations, lie detector results, the accusatory statement made by the deceased and other exculpatory facts, all of which were within detective McNesby's knowledge, and that any reasonable officer would have known a magistrate would need to make an independent determination of probable cause. Had this information been included, no arrest warrant would have issued;

d.    All the constitutional violations pleaded in this Complaint directly contributed to Mr. Staten's injuries by stripping him of the ability to defend himself against the false allegations with exculpatory and inconsistent statements and evidence that, if presented to a court prior to Mr. Staten's arrest or conviction, would have led to the rejection of the warrant application, the withdrawal of charges or an acquittal.

## **DAMAGES**

120.    The unconstitutional misconduct of defendant City of Philadelphia, by and through its employee and agent defendant Detective McNesby, and through its unconstitutional policies, practices and customs, caused Mr. Staten to be illegally arrested, maliciously prosecuted, and wrongfully convicted and incarcerated. The Defendant's unconstitutional misconduct caused Mr. Staten the terror of life imprisonment without a possibility of parole and the pain and suffering of 37-years of involuntary servitude, all the while believing he'd die in prison.

121.    Defendant's illegal arrest, malicious prosecution and wrongful conviction and incarceration of Mr. Staten caused him the loss of his youth, pain and suffering, mental anguish, emotional distress, countless indignities, permanent loss of human development, loss of freedom, involuntary servitude, loss of opportunity, loss of familial and intimate relations, post-traumatic stress disorder and the loss or curtailment of all of his constitutional rights, include his right to suffrage, freedom of speech, the right to peaceably assemble, freedom of religion and his bodily autonomy.

122.    Mr. Staten's is now a 71-year-old great-grandfather. When his wrongful imprisonment began, he lived with his beloved grandmother, who was the matriarch of the family. She has since passed.

123.    Now, Mr. Staten is the patriarch of his family, having suffered the loss of all his elders. His damages include the inability to attend any one of their funerals.

124.    As a direct result of Defendant's unconstitutional misconduct, Mr. Staten suffered economic damages. He has not contributed to any sort of retirement plan since his illegal arrest.

125.    Due to Defendant's unconstitutional misconduct, Mr. Staten suffered the indignities of inadequate medical and dental care.

126.    Due to Defendant's unconstitutional misconduct, Mr. Staten was forced to labor for pennies per hour as a prison employee, and to labor uncompensated as his own attorney, working to free himself from a wrongful murder conviction.

### COUNT I: 42 U.S.C. §1983
**Malicious Prosecution in Violation of the Fourth Amendment**

127.    Defendant Detective McNesby, acting individually and in concert with others known and unknown, and within the scope of his employment with defendant City of Philadelphia's Police Department, with malice and knowing that probable cause did not exist to

prosecute Mr. Staten for murder, arson, aggravated assault, and other related charges, through actions, testimony and deception, intentionally caused Mr. Staten to be arrested, charged and prosecuted for those crimes, thereby violating Mr. Staten's clearly established right, under the Fourth Amendment of the United States Constitution, to be free of arrest and prosecution absent probable cause.

128.    Defendant Detective McNesby fabricated evidence or presented evidence in an intentionally misleading way and intentionally withheld and misrepresented material relevant evidence, all of which resulted in the arrest and prosecution of Mr. Staten without probable cause.

129.    Defendant Detective McNesby performed the acts described in this Complaint under color of state law, intentionally, with reckless disregard for the truth, and with deliberate indifference to Mr. Staten's clearly established constitutional rights.  No reasonable police officer would have believed this conduct was lawful.

130.    Defendant Detective McNesby's falsehoods and omissions were used to obtain probable cause to arrest Mr. Staten.

131.    The prosecution finally terminated in Mr. Staten's favor on February 5, 2024, after the Philadelphia District Attorney's Office *nolle prossed* the charges against him.

132.    The acts and omissions by defendant Detective McNesby, as described in this Complaint, were the direct and proximate cause of Mr. Staten's illegal arrest, malicious prosecution, wrongful conviction and incarceration and injuries because defendant Detective McNesby knew, or should have known, that his conduct would result in the wrongful arrest, prosecution, conviction, and incarceration of Mr. Staten.

**COUNT II: 42 U.S.C. § 1983**
**Deprivation of Liberty without Due Process of Law and**
**Denial of a Fair Trial Under the Fourteenth Amendment**

133.    Defendant Detective McNesby, deprived Mr. Staten of his clearly established constitutional right to due process of law and to a fair trial by fabricating or tampering with evidence and deliberately using coercion, inducement, perjury, perjury by omission and suggestion to deprive Mr. Staten of a fair trial.

134.    Defendant Detective McNesby deprived Mr. Staten of his right to a fair trial by concealing, suppressing and withholding relevant and material evidence as described in this Complaint and perjuring himself by omission, all of which prevented Mr. Staten from mounting a viable defense.

135.    Defendant Detective McNesby's fabrications, tampering, concealment, suppression and withholding were performed under color of state law, intentionally and with reckless disregard for the truth, and with deliberate indifference to Mr. Staten's constitutional rights. No reasonable officer would have believed this conduct was lawful.

136.    Defendant Detective McNesby deprived Mr. Staten of his right to a fair trial by deliberately failing to conduct a constitutionally adequate investigation, including, without limitation, by failing to pursue or document information from various witnesses and forensic evidence to deceive by omission, perjury through omission and deliberately deceiving the Court, all of which would have led to Mr. Staten's prompt exoneration had the misconduct not occurred.

137.    Defendant Detective McNesby's acts and omissions, as described in this Complaint, were the direct and proximate cause of Mr. Staten's injuries. Defendants knew, or should have known, that their conduct would result in Mr. Staten's wrongful arrest, prosecution and incarceration.

**COUNT III: 42 U.S.C. § 1983**
**Municipal Liability Claim**

138.    Defendant City of Philadelphia, by and through its final policymakers, had in force and effect during time of Mr. Staten's wrongful arrest and conviction, and for many years preceding and following this investigation, policies, practices and customs of unconstitutional misconduct in homicide and other criminal investigations, including, the application of an unsound definition of probable cause in criminal investigations that was used in their submissions to judicial officers, the use of coercive and inducive techniques in interviews and interrogations to obtain evidence, the fabrication of inculpatory evidence, the fabrication of incriminating statements from witnesses, suspects and arrestees by coercion, suggestion, inducement and feeding details about the crime, including identifications and pertinent facts, without disclosure, the deceptive withholding of material and relevant evidence, perjury and perjury by omission.

139.    Final policymakers for defendant City of Philadelphia, had actual or constructive notice of these practices, policies and customs, but repeatedly failed to make any meaningful investigation into charges that their employees and agents were using unconstitutional methods, policies and practices, coercive and inducive techniques in interviews and interrogations to obtain false confessions and statements, deceptively withholding material and relevant evidence, fabricating evidence, and, particularly, fabricating incriminating statements from witnesses, suspects and arrestees by coercion, inducement, suggestion and feeding details about the crime, including identifications, and failed to take appropriate remedial and disciplinary actions to curb these patterns of misconduct.

140.    Such unconstitutional municipal customs, practices and policies were the moving force behind the wrongful arrest, conviction and illegal four-decade-long imprisonment of Mr.

Staten, as well as all the other injuries and damages as described in this Complaint and to be discovered in this litigation.

141.    Defendant City of Philadelphia caused the violation of Mr. Staten's constitutional rights by allowing employees like defendant McNesby and his coconspirators to run amok without consequence. Defendant City of Philadelphia, with deliberate indifference, employed customs, patterns, practices and policies allowing officers to use their position to unconstitutionally investigate, detain, arrest, prosecute and convict innocent individuals, and failed to train, supervise and discipline officers who engaged in such conduct.

142.    The allegations described in this Complaint were widespread throughout the Department, especially in the Homicide Unit, and were well-known to municipal policymakers.

143.    The failure to discontinue and end the conduct described in this Complaint caused Mr. Staten's wrongful arrest, conviction, and incarceration.

## COUNT IV
### Civil Rights Conspiracy

144.    Defendant McNesby and other City of Philadelphia employees, acting within the scope of their employment and under the color of state law, agreed among themselves and with other individuals, to act in concert to deprive Mr. Staten of his clearly established Fourth and Fourteenth Amendment rights to be free from unreasonable searches and seizures, false arrest, false imprisonment, malicious prosecution, deprivation of liberty without due process of law, to be informed of the nature and cause of accusations, to have compulsory process for obtaining witnesses in his favor, and to a fair trial.

145.    In furtherance of the conspiracy, the Defendants engaged in and facilitated numerous overt acts, including but not limited to, the following:

a.  the application of an unsound definition of probable cause in criminal investigations and submissions to judicial officers;

b.  suggesting, coercing, inducing and fabricating inculpatory evidence in the form of witness statements;

c.  coercing, inducing and fabricating witness statements and false identifications;

d.  intentionally or with deliberate indifference failing to comply with their duty to disclose material and relevant evidence during the pendency of the case;

e.  wrongfully arresting and prosecuting Mr. Staten while knowing they lacked probable cause;

f.  coercing and inducing false identifications;

g.  fabricating evidence and deliberating deceiving judicial officers.

146.    These acts and omissions, as described in the preceding paragraphs, were the direct and proximate cause of Mr. Staten's injuries. Defendants knew, or should have known, that their conduct would result in Mr. Staten's wrongful arrest, prosecution, conviction and incarceration.

## <u>COUNT V</u>
### State Law Claim

147.    Defendant McNesby's knowing, intentional and reckless false statements and knowing application of unsound definitions of probable causes were the direct and proximate cause of the prosecution of Mr. Staten. Defendant McNesby caused the prosecution of Mr. Staten without probable cause and defendant McNesby acted with malice or specific intent to injure.

148.    Mr. Staten suffered a deprivation of liberty because of the prosecution.

149.    Mr. Staten's arrest for murder was not prosecutable, hence the charges were *nolle prossed*.

**WHEREFORE**, Plaintiff, Harold Staten, seeks damages against Defendants, jointly and severally, in an amount greater than $75,000.00, including costs of suit, interest, attorney's fees, punitive/exemplary damages and such other relief as this Honorable Court deems appropriate.

**ROSS FELLER CASEY, LLP**

By: _/s/ Kevin Harden, Jr._____
Joel J. Feller, Esquire (ID #84443)
Kevin Harden, Jr., Esquire (ID #310164)
One Liberty Place - Suite 3450
1650 Market Street
Philadelphia, PA 19103
Tel: 215-574-2000