IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| HAROLD STATEN, | : | |
|     Plaintiff, | : | CIVIL ACTION |
| | : | No. 24-1380 |
| v. | : | |
| | : | |
| CITY OF PHILADELPHIA and | : | |
| DETECTIVE JAMES J. MCNESBY, | : | |
|     Defendants. | : | |

## MEMORANDUM

In October 1986, Harold Staten was convicted of second-degree murder, arson, and aggravated assault. Now that his conviction and life sentence have been vacated, he seeks to hold Defendants the City of Philadelphia ("the City") and Detective James J. McNesby ("McNesby") liable under 42 U.S.C. § 1983 and state law. Defendants move to dismiss Staten's suit. For the reasons that follow, the Court denies Defendants' motion to dismiss in its entirety.

## I.   BACKGROUND[1]

In the early morning hours of October 30, 1984, a North Philadelphia rowhome inhabited by Robert Williams, Marian DeBose, and Charles Harris caught fire. Am. Compl. ¶¶ 19, 32, 38, 65, ECF No. 13. All three escaped by jumping from second-floor windows. *Id*. ¶ 21. As Harris was being rushed to the emergency room, a firefighter saw him "hold his arms out with the skin hanging off" and exclaim to DeBose, his girlfriend, "Look, see what you did to me!" *Id*. ¶ 23 (cleaned up). Though Williams and DeBose survived, Harris ultimately died due to the severe

---

[1] The Court accepts all factual allegations in the Amended Complaint as true for purposes of addressing Defendants' Motion to Dismiss. *Vorchheimer v. Philadelphian Owners Ass'n*, 903 F.3d 100, 105 (3d Cir. 2018).

burns he sustained on "a significant portion of his upper torso." *Id.* ¶ 22.

The Philadelphia Police Department ("PPD") began an arson investigation, with McNesby serving as "lead detective." *Id.* ¶ 78. For reasons unexplained in the Amended Complaint, a forensic investigator quickly "presumed" that the fire was caused by "'an open flame applied to an accelerant'" and started in the rowhome's vestibule. *Id.* ¶ 28. Later testing and a separate fire detected on the second floor, however, suggested otherwise. When the PPD's crime laboratory tested samples from the vestibule, those samples contained "no detectible volatile flammable vapors." *Id.* ¶ 29. Separately, though a firefighter had "also noted a separate fire in the second-floor back bedroom" inhabited by Harris and DeBose, that fire "went uninvestigated." *Id.* ¶ 32. Despite the contradictory test results and separate second-floor fire, the PPD's official conclusion was that the fire was caused by "'an open flame applied to an accelerant'" in the vestibule. *Id.* ¶ 28.

Early on in the investigation, investigators caught wind of a "neighborhood rumor": Harold Staten (an exterminator) thought that Williams had stolen his pest control supplies and had previously threatened to burn down the rowhome in retribution. *Id.* ¶¶ 38, 65. Investigators thus "developed a theory"—one that dovetailed neatly with the purported cause and origin of the fire—that Staten had acted on that threat by using his pest control supplies to start the fire. *Id.* ¶¶ 38-39, 65. However, when investigators interviewed Williams in October or November 1984, Williams told them that (1) "Staten hadn't threatened him" or "threatened to burn the house down over missing pest control products"; and (2) he "didn't think [] Staten started a fire." *Id.* ¶¶ 64-68. Investigators kept records of Williams' interview but did not give those records to Staten until long after his trial. *See id.*

Despite Williams denying the neighborhood rumor, investigators zeroed in on Staten.

Although Staten acknowledged that he and Williams had previously had "a dispute" over his missing pest control supplies, he told investigators "that the dispute had been resolved." *Id.* ¶¶ 40-41. Staten also (1) gave investigators "the names of the men responsible for the theft"; (2) provided "an alibi and [names of] witnesses to his whereabouts on the evening of the fire"; (3) explained that "his pest control supplies were not flammable" and gave them a list of the brands he used; and (4) agreed to a polygraph examination (the results of which revealed "'no deception indicated' regarding his lack of involvement in the fire"). *Id.* ¶¶ 41-44. Separately, unbeknownst to Staten until 2022, a number of witnesses gave exculpatory statements that investigators either failed to record or recorded but withheld. *Id.* ¶¶ 34, 57-58.

At some point during the investigation, investigators "found and interviewed a 17-year-old girl" who lived across the street from the rowhome and claimed she was home the night of the fire. *Id.* ¶ 35. When she was first interviewed, she said she had been "awakened by a resident of the [rowhome] screaming about the fire and her broken legs" and denied seeing Staten before, during, or after the fire. *Id.* ¶¶ 35-36. Four months later—after McNesby and other investigators began secretly treating her to lunch—she "abruptly changed her story" and claimed she saw Staten "at the steps of the rowhome with a hose and can starting the fire." *Id.* ¶ 46; *see also id.* ¶¶ 60-61 (noting that "none of these lunches were documented" or otherwise disclosed to Staten until after he was convicted).

On or around March 20, 1986, McNesby signed and submitted an affidavit of probable cause in support of a warrant for Staten's arrest. *Id.* ¶ 31. The affidavit mentioned only that (1) Staten believed that Williams had stolen his pest control supplies and had threatened to burn the rowhome down in retribution; and (2) a witness had seen Staten start the fire. *See id.* ¶¶ 45-46,

66.[2]

In October 1986, Staten's case culminated in a bench trial. *Id.* ¶ 50. Among those who testified were Williams, the seventeen-year-old, and the seventeen-year-old's boyfriend who was with her the night of the fire. *See id.* ¶¶ 47-50, 65-66. Williams established Staten's motive for committing arson by testifying that Staten had previously threatened to burn the rowhome down over his missing pest control supplies. *See id.* ¶¶ 64-66. The seventeen-year-old gave the "sole eyewitness" account of Staten starting the fire, *id.* ¶ 59, testifying that she saw Staten "huddled at the front door, using a hose to put liquid through the mail slot of the home" after which it erupted in flames, *id.* ¶ 47. Her boyfriend, however, testified "that she was sleeping when they first heard the screams for help." *Id.* ¶ 49. Despite this conflicting testimony, the court convicted Staten of second-degree murder, arson, and aggravated assault. *Id.* ¶ 50.

For over a year, the court delayed sentencing to hear evidence from witnesses that Staten's initial trial counsel failed to call at trial. *Id.* ¶ 51. Among these were "numerous witnesses" who refuted the testimony of the seventeen-year-old eyewitness, including a witness who testified that the seventeen-year-old "decided to lie" about what she saw "after investigators began treating her to lunch." *Id.* ¶¶ 52, 61; *see also id.* ¶ 60 (seventeen-year-old was "blacked out from a combination of alcohol and cocaine" and had to be carried to bed by her boyfriend and her roommate the night of the fire). After hearing all the additional testimony, the court stated "on the record" that Staten "merit[ed] a new trial"; however, after two years of deliberation, the court entered an order denying

---

[2] At some point before Staten was convicted, an unnamed witness told investigators that Staten had confessed to him. *See* Am. Compl. ¶ 63. The Amended Complaint does not say whether this information was included in the affidavit of probable cause and/or was introduced at trial. It does say, however, that the unnamed witness "revealed [] he was incarcerated on the day he claimed to have had an incriminating conversation with [] Staten" after Staten was convicted. *Id.*

Staten's post-trial motions[3] without any accompanying explanation, and on February 8, 1989, sentenced Staten to life. *Id.* ¶¶ 54-56.

Decades later, two forensic fire investigators—one hired by Staten, the other by the Philadelphia District Attorney's Office—began reinvestigating the case. *See id.* ¶¶ 70-72. Both "concluded that the cause of the fire should have been ruled 'undetermined.'" *Id*. ¶ 72 ("a misunderstanding and application of fire science principle [had] led to unsupportable conclusions about the origin and cause of the fire"). Armed with "proof of the false fire science," Staten filed a PCRA petition for relief from his conviction and sentence. *Id.* ¶¶ 4-5, 75. On February 5, 2024, he was finally vindicated: the Philadelphia Court of Common Pleas ordered a new trial and the Philadelphia District Attorney's Office *nolle prossed* the charges against him. *See id.* ¶¶ 5, 7, 131.

## II. PROCEDURAL HISTORY

On April 3, 2024, Staten sued the City and McNesby, alleging violations of his federal rights under 42 U.S.C. § 1983 and state law stemming from his arrest, prosecution, conviction, and thirty-seven-plus years of incarceration. More specifically, Staten brings: (1) a Fourth Amendment malicious prosecution claim under § 1983 against McNesby (Count I); (2) a Fourteenth Amendment claim against McNesby (Count II);[4] (3) a state law malicious prosecution claim against McNesby (Count V); (4) a *Monell* claim against the City (Count III); and (5) a civil rights conspiracy claim against both Defendants (Count IV). *See id*.

On July 24, 2024, Defendants moved to dismiss Staten's Amended Complaint in its entirety. *See* Defs.' Mot. to Dismiss Am. Compl., ECF No. 32 (hereinafter "Mot. to Dismiss"); Defs.' Reply, ECF No. 42 (hereinafter "Reply"). Defendants' arguments are threefold. First, they

---

[3] The Amended Complaint references "post-trial motions" but does not say exactly what they were. *See* Am. Compl. ¶ 55.
[4] As discussed in greater detail below, Count II encompasses two claims: fabrication of evidence and deliberate deception. *See infra* Sections IV.B.2-3.

argue that McNesby had probable cause and lacked malice, barring both of Staten's malicious prosecution claims (Counts I and V). Second, they assert that McNesby is entitled to qualified immunity on Staten's Fourth and Fourteenth Amendment claims (Counts I and II). Third, they argue that Staten fails to plead his *Monell* and civil conspiracy claims (Counts III and IV). The Court will address each argument in turn below.

### III. LEGAL STANDARD

In deciding a motion to dismiss under Rule 12(b)(6), a court must "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Phillips v. Cty. of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008) (internal quotation marks omitted).

To survive dismissal, a complaint must allege facts sufficient to "raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Rather, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Id.* (internal quotation marks omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

### IV. DISCUSSION

#### A. Malicious Prosecution under the Fourth Amendment and State Law (Counts I and V)

Staten asserts Fourth Amendment and state law malicious prosecution claims against McNesby. Am. Compl. ¶¶ 127-132 (Fourth Amendment claim), 147-49 (state law claim). To allege malicious prosecution under § 1983, a plaintiff must show that "(1) the defendants initiated

a criminal proceeding; (2) the criminal proceeding ended in plaintiff's favor; (3) the proceeding was initiated without probable cause; (4) the defendants acted maliciously or for a purpose other than bringing the plaintiff to justice; and (5) the plaintiff suffered deprivation of liberty consistent with the concept of seizure as a consequence of a legal proceeding." *Est. of Smith v. Marasco*, 318 F.3d 497, 521 (3d Cir. 2003) (citing *Donahue v. Gavin*, 280 F.3d 371, 379-80 (3d Cir. 2002)). Under Pennsylvania law, "malicious prosecution has three elements.  The defendant must have instituted proceedings against the plaintiff (1) without probable cause, (2) with malice, and (3) the proceedings must have terminated in favor of the plaintiff." *Kelley v. Gen. Teamsters, Chauffeurs & Helpers, Loc. Union 249*, 544 A.2d 940, 941 (Pa. 1988).

Defendants argue that both of Staten's malicious prosecution claims fail because McNesby had probable cause and nothing in the Amended Complaint suggests he acted maliciously.  *See* Mot. to Dismiss 9-13.  The Court will address probable cause and malice in turn.

### 1. Probable Cause

The "proceedings" against Staten started when he was arrested pursuant to a warrant. *See* Am. Compl. ¶ 31.  According to the Amended Complaint, McNesby wrote and swore the affidavit of probable cause submitted in support of Staten's arrest warrant. *Id.*  Therefore, to establish that the proceedings against him were initiated without probable cause, Staten must show that (1) McNesby, "with at least a reckless disregard for the truth, made false statements or omissions that create[d] a falsehood in applying for [the] warrant," and (2) those assertions or omissions were "material, or necessary, to the finding of probable cause." *Andrews v. Scuilli*, 853 F.3d 690, 697 (3d Cir. 2017) (internal citations omitted).  Omissions are made with reckless disregard for the truth when an officer withholds facts that "[a]ny reasonable person would have known . . . a judge would wish to know." *Wilson v. Russo*, 212 F.3d 781, 788 (3d Cir. 2000) (quoting *United States*

*v. Jacobs*, 986 F.2d 1231, 1235 (8th Cir. 1993)). "[A]n officer must have knowledge of the information alleged to have been recklessly omitted" and "the information must be relevant to the existence of probable cause," meaning "a reasonable person would know that it *could* affect [a judge's] probable cause determination[.]" *Dempsey v. Bucknell Univ.*, 834 F.3d 457, 471, 471 n.9 (3d Cir. 2016) (emphasis in original). Assertions are made with reckless disregard for the truth "when viewing all the evidence, the affiant must have entertained serious doubts as to the truth of his statements or had obvious reasons to doubt the accuracy of the information he reported." *Wilson*, 212 F.3d at 788 (quoting *United States v. Clapp*, 46 F.3d 795, 801 n.6 (8th Cir. 1995)).

Defendants' position is that none of McNesby's alleged omissions and assertions were reckless or, if corrected, would otherwise "alter the probable cause determination." Mot. to Dismiss 11. The Court disagrees. According to the Amended Complaint, McNesby's affidavit only included the following: (1) Staten had threatened to burn Williams' house down over a dispute regarding pest control supplies; and (2) the 17-year-old's eyewitness account of Staten starting the fire. *See* Am. Compl. ¶¶ 45-47 (discussing eyewitness account), 65-68 (discussing threat-related allegations). However, when Williams was interviewed in the fall of 1984, long before McNesby submitted the affidavit in March 1986, Williams said that "Staten hadn't threatened him" or "threatened to burn the house down over missing pest control products," and furthermore, that he "didn't think [] Staten started a fire." *Id.* ¶¶ 64-68.[5] Williams' statements negate Staten's purported motive and are exactly the kind of information that "[a]ny reasonable person would have known . . . a judge would wish to know." *Wilson*, 212 F.3d at 788. Furthermore, the eyewitness

---

[5] Williams' statements were recorded in a "Philadelphia Police Department Arson Investigation Memo" (dated October 30, 1984) and "Activity Sheet" (dated November 17, 1984). Am. Compl. ¶¶ 64, 66. Drawing all reasonable inferences in Staten's favor, McNesby—as "the lead detective" on the case—presumably reviewed these files before swearing the affidavit of probable cause for Staten's arrest. *Id.* ¶ 78.

Page **8** of **18**

account included in the affidavit was completely contrary to the seventeen-year-old's first interview and only came to light four months *after* investigators (including McNesby) began treating her to lunch. Am. Compl. ¶¶ 45-46, 60-61. At the time he swore the affidavit, McNesby knew that the seventeen-year-old's eyewitness account was completely contrary to her initial account and was also aware of other "serious concerns" that would have severely undermined her credibility. *Id.* ¶¶ 60 (eyewitness was "blacked out from a combination of alcohol and cocaine" the night of the fire), 62 (eyewitness "had a documented history of drug and alcohol abuse . . . and a significant history of mental health problems, including short- and long-term memory loss[.]"). McNesby would have therefore "had obvious reasons to doubt the accuracy" of the eyewitness account he included in the affidavit. *Wilson*, 212 F.3d at 788 (internal citation omitted). A corrected warrant affidavit—one that included Williams' statements to police, and either excluded or told the full story behind the seventeen-year-old's eyewitness account—would not have otherwise established probable cause for Staten's arrest.[6]

    2.    **Malice**

An officer's decision to "omit crucial exculpatory information from [an] affidavit of probable cause" can equate to malice. *Harvard v. Cesnalis*, 973 F.3d 190, 203 (3d Cir. 2020) (a reasonable juror could find that officer who "mischaracterized [] events and chose to omit crucial exculpatory information from [an] affidavit of probable cause" acted with malice or for purposes other than bringing defendant to justice); *see also Kelley*, 544 A.2d at 941 ("Malice may be inferred from the absence of probable cause."). According to the Amended Complaint, the affidavit failed

---

[6] Defendants also contend that Staten's confession to a civilian witness was (1) included in the affidavit and (2) established probable cause for his arrest. *See* Mot. to Dismiss 5, 11. As Staten has not alleged that the confession was included in the affidavit, the Court may not consider Defendants' argument at this phase of the case. *Phillips*, 515 F.3d at 233 (in deciding a motion to dismiss, a court must "accept all factual allegations as true [and] construe [them] in the light most favorable to the plaintiff . . .").

to mention (1) any of the credibility issues associated with the seventeen-year-old's version of events; and (2) "numerous" exculpatory eyewitness accounts. *See* Am. Compl. ¶¶ 60, 62, 119(b) (discussing credibility issues); *id.* ¶ 34 (exculpatory eyewitness accounts). Accepting these allegations as true and drawing all reasonable inferences in Staten's favor, McNesby chose to omit this information from the affidavit to bolster an otherwise tenuous case against Staten. *Cf. Harvard*, 973 F.3d at 204.

For purposes of a motion to dismiss, Staten has sufficiently pleaded that McNesby lacked probable cause and acted with malice. The Court will therefore deny Defendants' motion to dismiss Counts I and V.

### B. Qualified Immunity

Section 1983 "permits suits against state government officials who deprive individuals of 'any rights, privileges, or immunities secured by the Constitution and laws.'" *Mack v. Yost*, 63 F.4th 211, 222 (3d Cir. 2023) (quoting 42 U.S.C. § 1983). Though "the statute on its face admits of no immunities," the Supreme Court has held that most government employees, including police officers, enjoy qualified immunity from § 1983 suits. *Malley v. Briggs*, 475 U.S. 335, 339 (1986). Even when they violate the Constitution or a federal statute, police officers "are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).

When presented with a qualified immunity defense, a court must ask two questions: (1) whether the plaintiff has sufficiently alleged the violation of a constitutional right; and (2) whether the right was "clearly established" at the time of the official's conduct. *Dennis v. City of*

*Philadelphia*, 19 F.4th 279, 287 (3d Cir. 2021).[7] A court may address these questions in either order. *See Pearson v. Callahan*, 555 U.S. 223, 227 (2009). "The burden of establishing qualified immunity falls to the official claiming it as a defense." *Burns v. Pa. Dep't of Corr.*, 642 F.3d 163, 176 (3d Cir. 2011). Because the case is before the Court on a motion to dismiss, the Court will construe the Amended Complaint liberally and take its factual allegations as true when performing this analysis. *See Clark v. Coupe*, 55 F.4th 167, 178 (3d Cir. 2022).

In this case, Defendants contend that McNesby is entitled to qualified immunity on each of Staten's constitutional claims (Counts I and II).[8] The Court will address each claim in turn.

### 1. Fourth Amendment Malicious Prosecution Claim (Count I)

Defendants argue that McNesby is entitled to qualified immunity on Staten's Fourth Amendment malicious prosecution claim because he had probable cause. *See* Mot. to Dismiss 16-17. Defendants are correct that probable cause *would* entitle McNesby to qualified immunity.

---

[7] The "clearly established" standard seeks to "shield officials from harassment, distraction, and liability when they perform their duties reasonably" while still "hold[ing] [them] accountable when they exercise power irresponsibly . . . ." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). "A right is clearly established if it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Reedy v. Evanson*, 615 F.3d 197, 224 (3d Cir. 2010) (internal quotation marks omitted). This means that there is either "a closely analogous case that establishes that the Defendant's conduct was unconstitutional" or "that the Defendant's conduct was so patently violative of the constitutional right that reasonable officials would know without guidance from a court." *Schneyder v. Smith*, 653 F.3d 313, 330 (3d Cir. 2011) (quoting *Est. of Escobedo v. Bender*, 600 F.3d 770, 780 (7th Cir. 2010)); *see also Mack v. Yost*, 63 F.4th 211, 232 (3d Cir. 2023) (a right can be clearly established "even without a precise factual correspondence between the case at issue and a previous case.").

[8] Defendants contend that McNesby is entitled to qualified immunity on Staten's § 1983 malicious prosecution claim to the extent it relies on the Fourteenth Amendment because "there is no clearly established procedural due process right against malicious prosecution[.]" *See* Mot. to Dismiss 14-15. However, Staten expressly pleads his § 1983 malicious prosecution claim only under the Fourth Amendment. *See* Am. Compl. ¶¶ 127-132 (Count I, "Malicious Prosecution in Violation of the Fourth Amendment). He also explains that his Fourteenth Amendment "claims are . . . like those described in" *Dennis v. City of Philadelphia*, 19 F.4th 279 (3d Cir. 2021)—a case that dealt with claims for fabrication of evidence and deliberate deception but *not* malicious prosecution. Resp. to Mot. to Dismiss 5, ECF No. 36 (hereinafter "Resp."). Accordingly, because it appears that the only "constitutional peg" Staten hangs his malicious prosecution claim on is the Fourth Amendment, the Court need not address Defendants' argument on this point. *Albright v. Oliver*, 510 U.S. 266, 270 n.4 (1994).

*Goodwin v. Conway*, 836 F.3d 321, 327 (3d Cir. 2016). However, as discussed above, Staten has adequately pleaded that McNesby lacked it. The Court will therefore deny Defendants' motion to dismiss Count I on qualified immunity grounds.

### 2. Fourteenth Amendment - Fabrication of Evidence (Count II)

Staten alleges that McNesby knowingly fabricated evidence in violation of the Fourteenth Amendment. *See* Am. Compl. ¶ 133. Defendants contend that McNesby is entitled to qualified immunity on this claim because the right underlying it—the right not to be convicted on perjured testimony—has only ever been recognized in cases involving prosecutors and thus "simply does not apply" to McNesby. Reply 12-13. Stated otherwise, Defendants argue that Staten fails to state a violation of a clearly established right because McNesby was not a prosecutor. *See id*. at 11-12.

Defendants' narrow construction of the right is untenable. By 1986—the year McNesby swore and submitted the affidavit of probable cause and Staten proceeded to trial—*any* reasonable state actor would have had ample fair and clear warning that fabricating inculpatory evidence against a defendant violates due process. *Halsey v. Pfeiffer*, 750 F.3d 273, 295-96 (3d Cir. 2014); *Dennis*, 19 F.4th at 289. By that time, there was decades-old Supreme Court precedent forbidding prosecutors from "knowingly using perjured testimony to secure a conviction"—precedent that the Court of Appeals for the Third Circuit has repeatedly deemed "closely analogous" to an investigator's fabrication of evidence to "bring about [a] prosecution or to help secure [a] conviction." *Halsey*, 750 F.3d at 296 (discussing *Pyle v. Kansas*, 317 U.S. 213, 216 (1942) and *Miller v. Pate*, 386 U.S. 1, 7 (1967)); *Dennis*, 19 F.4th at 289 ("*Halsey* established that sufficiently particularized precedent placed these detectives on notice that fabricating evidence to convict a criminal defendant is unconstitutional, regardless of whether that evidence is inserted into a confession to 'bring about' his prosecution or to help secure his conviction."); *see also Mervilus*

*v. Union Cnty.*, 73 F.4th 185, 196 (3d Cir. 2023) (noting that "the due process protection against criminal investigators' fabrication of inculpatory evidence against a defendant . . . ha[s] long been recognized by the Supreme Court and Courts of Appeal," collecting cases). But even without this precedent, it has always been "an axiomatic principle of our justice system that those charged with upholding the law are prohibited from deliberately fabricating evidence and framing individuals for crimes they did not commit." *Halsey*, 750 F.3d at 296 (cleaned up). To put it plainly: the "obviousness of this violation would [have been] difficult to escape" long before the investigation began in this case. *Id*.

Having determined that the right at issue was clearly established, the Court now addresses whether Staten has pleaded a violation of that right. "If a defendant has been convicted at a trial at which the prosecution has used fabricated evidence, the defendant has a stand-alone claim under section 1983 based on the Fourteenth Amendment." *Mervilus*, 73 F.4th at 193. To succeed on his claim against McNesby, Staten must establish "there is a reasonable likelihood" that he would not have been convicted without the use of the allegedly fabricated evidence. *Halsey*, 750 F.3d at 294; *see also Black v. Montgomery Cnty.*, 835 F.3d 358, 372 (3d Cir. 2016) (plaintiff must draw "a meaningful connection" between fabricated evidence and due process violation). Staten must also provide "persuasive evidence" that McNesby "formulated or submitted false evidence willfully, knowingly, or with a reckless disregard for its truth." *Mervilus*, 73 F.4th at 194-95.

At this early stage of the case, Staten has made the requisite showings. According to the Amended Complaint, McNesby and other investigators secretly coerced a seventeen-year-old into saying she saw Staten start the fire after she initially claimed she never saw him. *See* Am. Compl. ¶¶ 60-62, 117-18, 119(b). As discussed in greater detail above, McNesby had ample reasons to doubt that the seventeen-year-old's new account was true. And because she gave the *only*

eyewitness account at trial, there is a reasonable likelihood that Staten would not have been convicted without her false account. The Court will therefore deny Defendants' motion to dismiss the fabrication of evidence claim.

### 3. Fourteenth Amendment - Deliberate Deception (Count II)

Staten also alleges that McNesby deliberately concealed, suppressed, and withheld relevant and material evidence in violation of the Fourteenth Amendment. *See* Am. Compl. ¶ 134. Defendants argue that Staten's "deliberate deception claim is merely a *Brady* claim by another name" and contend that the right underlying it—to have exculpatory or impeachment evidence disclosed—was not clearly established by the time Staten was convicted in 1986. Reply 9; Mot. to Dismiss 15.

As a threshold matter, allowing Defendants to "recharacterize" Staten's claim to their liking "would run afoul of the longstanding principle that . . . a defendant cannot create a cause of action from the fact pattern on behalf of the plaintiff." *Dennis*, 19 F.4th at 291. To the contrary: "[i]t is the party suing, not the party sued, who enjoys the right to frame the claims asserted in a complaint." *Id.* (quoting *Haley v. City of Bos.*, 657 F.3d 39, 49 (1st Cir. 2011)). But beyond that, Defendants' position misconstrues Staten's claim and the underlying right it implicates.

"A *Brady* claim, in essence, is a claim by a defendant that his due process rights were violated by the failure to disclose exculpatory or impeachment evidence to the defense." *Dennis*, 19 F.4th at 291. A deliberate deception claim "go[es] beyond the failure to disclose evidence and arises when imprisonment results from the *knowing* use of false testimony or other fabricated evidence or from concealing evidence to create false testimony to secure a conviction." *Id.* (emphasis in original) (citing *Mooney v. Holohan*, 294 U.S. 103, 112 (1935)). And unlike a *Brady* claim, a deliberate deception claim is rooted in "the right not to be framed by the use of perjured

witness testimony at trial"—which, as discussed above, was clearly established long before the events in question. *Id.* at 290 (citing *Mooney*, 294 U.S. at 103).

The allegations here go beyond a mere failure to disclose. To be sure, the Amended Complaint certainly alleges that certain pieces of exculpatory and impeachment evidence were withheld for 36 years following Staten's trial. *See, e.g.*, Am. Compl. ¶¶ 57 ("numerous statements exculpating [] Staten were withheld . . . until 2022"). However, it also alleges that McNesby and other investigators repeatedly treated a seventeen-year-old to lunch in an effort to coerce her into providing what would be the "sole eyewitness" account of Staten's alleged misconduct at trial. *See id.* ¶¶ 60-62, 117-18, 119(b). None of these lunches were documented and only came to light at a post-trial hearing through a third-party witness. *Id.* ¶ 61. These allegations plausibly suggest that McNesby not only fabricated the seventeen-year-old's account, but also concealed evidence that would have revealed it was fabricated, in an effort to secure Staten's conviction. *Dennis*, 19 F.4th at 291-92. Accordingly, the Court will deny Defendants' motion to dismiss the deliberate deception claim.

  C. *Monell* **Claim (Count III)**

Staten also brings a *Monell* claim against the City of Philadelphia, alleging both "policy or custom" and "failure to train, discipline, or supervise" theories of municipal liability. Am. Compl. ¶¶ 138-43; *see also Forrest v. Parry*, 930 F.3d 93, 105 (3d Cir. 2019) (outlining two theories of *Monell* liability). Defendants contend that Staten did not plead enough facts to support his claim under either theory. *See* Mot. to Dismiss 18-24.

To succeed under a "policy or custom" theory, a plaintiff must point to "an official proclamation, policy or edict by a decisionmaker possessing final authority to establish municipal policy on the relevant subject," or a practice "so well-settled and permanent as to virtually

constitute law." *Forrest*, 930 F.3d at 105-06; *see also Fletcher v. O'Donnell*, 867 F.2d 791, 794 (3d Cir. 1989) ("Custom may be established by proof of knowledge and acquiescence."). In a case involving an alleged custom, a plaintiff need not identify a decisionmaker by name; rather, the custom can be "ascribable to municipal decisionmakers." *Bielevicz v. Dubinon*, 915 F.2d 845, 850 (3d Cir. 1990). Even still, a plaintiff "must demonstrate a plausible nexus or affirmative link between the municipality's custom and the specific deprivation of constitutional rights at issue." *Id.* (internal quotation marks omitted).

To succeed on a "failure to train, discipline, or supervise" theory, a plaintiff must show that the failure "amounts to deliberate indifference to the rights of persons with whom the police come into contact." *City of Canton, Ohio v. Harris*, 489 U.S. 378, 388 (1989). This means that "(1) municipal policymakers know that employees will confront a particular situation, (2) the situation involves a difficult choice or a history of employees mishandling, and (3) the wrong choice by an employee will frequently cause deprivation of constitutional rights." *Forrest*, 930 F.3d at 106. Alleging facts about "the City's inadequate disciplinary systems and how the City was aware of repeated constitutional violations but deliberately failed to act" is sufficient to survive a motion to dismiss. *Swainson v. City of Philadelphia*, 2023 WL 144283, *5 (E.D. Pa. Jan. 10, 2023); *Alicea v. City of Philadelphia*, 2022 WL 17477143, at *6 (E.D. Pa. Dec. 6, 2022).

Given that "*Monell* liability is generally not amenable to resolution at the pleading stage, as it requires a plaintiff to plead facts outside or her knowledge," the Court concludes that Staten has adequately alleged a *Monell* claim under both theories. *3909 Realty LLC v. City of Philadelphia*, 2021 WL 2342929, at *4 (E.D. Pa. June 8, 2021). First, Staten sufficiently pleads that the City had a custom of acquiescing to pervasive unconstitutional misconduct by the PPD. Am. Compl. ¶ 79. More specifically, Staten alleges the City knew but did not stop the PPD from

coercing and inducing false witness statements, fabricating inculpatory evidence, concealing exculpatory evidence, and omitting or deleting exculpatory evidence from charging documents and investigative files. *See id.* ¶¶ 79-85. These are the same practices that led to Staten's constitutional injuries. To show the City had the requisite knowledge of this pervasive misconduct, Staten cites newspaper articles, a consent decree, and a number of other cases detailing this misconduct from the late 1970s through the present day. *See id.* ¶¶ 85-102, 104-11; *see also Tellabs, Inc. v. Makor Issues & Rts.*, Ltd., 551 U.S. 308, 322 (2007) (when ruling on Rule 12(b)(6) motions to dismiss, "courts must consider the complaint in its entirety, as well as other sources courts ordinarily examine . . . in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice."); *Est. of Roman v. City of Newark*, 914 F.3d 789, 796-98 (3d Cir. 2019) (considering consent decree, newspaper article, and press release "referenced" in complaint in assessing sufficiency of allegations regarding municipal custom).[9] Second, Staten describes the City's deficient disciplinary system—a system that failed to adequately investigate allegations of misconduct, timely resolve complaints, or deter repeat offenders within the PPD—with adequate specificity. Am. Compl. ¶¶ 111(b), (d), (f), 112. Staten also alleges that at the time he was arrested, prosecuted, and convicted, the PPD employed an "unsound" definition of probable cause and included that definition in training materials and directives that were authorized by the PPD's Police Chief. *Id.* ¶ 119(a); *see also id.* ¶ 113-16. At the pleading stage, these allegations are sufficient to "raise a right to relief above the speculative level" under either theory of municipal liability. *Twombly*, 550 U.S. at 555. The Court will

---

[9] Defendants claim that "many of the incidents" Staten cites "are not sufficiently similar in kind to the allegations of police misconduct he raises in his suit." Mot. to Dismiss 20. The Court agrees that "the facts of some of the cited cases are clearly distinguishable" from Staten's experience; nonetheless, "the breadth of misconduct which they represent is highly relevant to the existence of the City's custom of acquiescence in PPD's allegedly unconstitutional actions." *Alicea*, 2022 WL 17477143, at *5(denying motion to dismiss municipal liability claim).

therefore deny Defendant's motion to dismiss Staten's municipal liability claim.

### D. Civil Rights Conspiracy Claim (Count IV)

Staten also asserts a § 1983 conspiracy claim against McNesby "and other City [] employees." Am. Compl. ¶ 144. "To prevail on a conspiracy claim under § 1983, a plaintiff must prove that persons acting under color of state law reached an understanding to deprive him of his constitutional rights." *Harvard*, 973 F.3d at 207 (quoting *Jutrowski v. Township of Riverdale*, 904 F.3d 280, 293-94 (3d Cir. 2018)).

Defendants move to dismiss Staten's conspiracy claim because he fails to identify any state actors—besides McNesby—who conspired to deprive him of his constitutional rights. Mot. to Dismiss 24-26. However, as Staten notes in briefing, he cannot name the other actors without discovery. Resp. 12. Given that "caution is advised in any pre-trial disposition of conspiracy allegations in civil rights actions," the Court will deny Defendants' motion to dismiss Staten's § 1983 conspiracy claim. *Capogrosso v. The Supreme Court of New Jersey*, 588 F.3d 180, 184-85 (3d Cir. 2009) (internal citation omitted); *see also Jones v. Burlington Twp.*, 2017 WL 6372232, at *9 n.18 (D.N.J. Dec. 13, 2017) (declining to dismiss conspiracy claim)

### III. CONCLUSION

For the foregoing reasons, the Court denies Defendants' Motion to Dismiss without prejudice to raise McNesby's entitlement to qualified immunity at a later stage in the proceedings, if applicable.